Mr. Pender, we would be happy to hear from you, sir. Thank you, Your Honor. I think it goes without saying that the overall conduct in this case that was directed at Juror A was outrageous and was egregious. But I think the question here that ultimately we need to answer is whether or not the no impeachment rule is going to apply in a way that allows that to take place in this case as well as in cases going forward. We believe that there's at least two exceptions to that rule that apply here. First, I'd like to address the exception, the outside influence exception. We believe that the legislative intent behind that rule actually supports the evidence of the threats in particular coming in in this case. And I would point the court first back to United States v. Tanner, which is a Supreme Court case. We cited that case in our brief for the proposition that the court should have analyzed the nature of the threat, not simply when and where it happened. So what is the outside influence? The outside influence in this case, Your Honor, there's actually two that I'd like to focus on. One is the threats that were made against Juror A from Juror B. How is that an outside influence? Well, so if I could kind of go where I'm going, I think it might answer that question. So in Tanner on 122 and 123, it gives a really concise description of the legislative intent. And actually what it says there is that the House, when it looked at this rule, actually said that outside influence included threats against someone's family. That's actually consistent. Well, I think we would argue that respectfully, I think we would argue that it is the rule because an outside influence is not simply whether or not it happened inside or outside of jury deliberations. It has to do with the influence on the juror. Well, let me ask you this. You know, you often have heated discussions in a jury deliberation. And I guess the problem would be in terms of threats of outside influence, where do you draw the line? Now, my question to you is, can we draw it with true threats? And I don't really see the difference between a threat to a jury juror out in the hall or a threat to a jury inside the jury room. A threat's a threat. Your Honor, I would agree with that wholeheartedly. I don't think there is a difference. I think it operates exactly the way it operates in the case where this juror tells us he only voted the way that he voted because he was placed in fear by this other juror. Well, do we have the some discretion to expand, enter, enter, and enter jury, well, the impeachment room. Do we have some discretion to modify that impeachment room? I think you do. I don't think you necessarily need to do that in this case. And that is part of why I really started with that legislative intent. Because I think what we kind of run into, and I think you even see this in some of the cases, is this conflation of 606B2A and 606B2B. 606B2A is an extraneous influence, improper, excuse me, let me make sure I state that correctly. An improper, something outside the case that the juror has considered that has to do with the case, such as a newspaper article, such as a radio story on the case, such as something they've seen on Facebook about the case. That is a different analysis from the outside influence. I think in some of the cases, it kind of looks like those run together, and it's very easy to do. I did it myself in going through the analysis. But the outside influence exception is separate. And part of why I point to that legislative intent is because it's silent on who the threat needs to come from. And Your Honor, I think that goes precisely to your point. So what case do you have that justifies your argument? I'm on point. Your Honor, there really aren't very many that are on, I haven't found any that are directly on point with this issue. Well, let me ask you this, due to textual analysis, 606B defines outside influence as an influence improperly brought to bear on any juror. Doesn't that place focus on how a communication impacts a juror and not occur? Absolutely, Your Honor. Absolutely. Would that be a stretch in reading it that way? I don't think it is. And I know that the government even noted in their brief that we were somewhat flawed in focusing on the effect on the juror. But I think under the outside influence exception, I think that's precisely what you need to be looking at. What evidence is there that the argument between the jurors or the friction between the jurors actually reflected any racial animus toward Mr. Brown, or that it affected somebody's I mean, you can have two jurors who do not get along at all. But that doesn't mean that they took it out on the defendant in any kind of impermissible way. And I don't understand, where was the, is there any evidence that racial animus toward Brown motivated somebody's vote here? No, Your Honor, there's not. Don't we need that? Don't we need that? Your Honor, I don't think we do. Pena Rodriguez is silent on who the racial animus needs to be directed at or who it needs to come from. What it is clear on is the racial animus cannot motivate someone's vote to convict. And in this case, the racial animus, and I'm jumping a bit because this is getting more into the Pena Rodriguez part of the argument, but the racial animus is directed from Juror B and by Juror A's affidavit, at least some of the other jurors, towards Juror A, who is Mexican. And Juror A's, the pressure and the fear that he felt as a result of that motivated his decision to convict. So where does he say that in his affidavit? Where does he say what specifically, Your Honor? Well, you're making the argument in response to Judge Wilkinson that there was some source of racial animus that animated his vote in some way. And so I'm looking at his affidavit, the JA-511, asking you if you can show me where that pairs. Your Honor, I think I would ask you to flip over one page to JA-512 and look specifically at paragraphs 6 through 9. That broadly lays out, as specifically as he lays it out, all of what happened in that case. But specifically, paragraph 9, he says, the other jurors were aware of my concerns with the evidence. I was mocked, bullied, and threatened prior to agreeing to vote for a guilty verdict. So what's that got to do with racial animus? The racial animus, well, two things. So one, the racial animus presents itself in two ways. One way it presents is that he does say that he was mocked and that he was mocked because of his Mexican heritage while in the jury room. But I think the most glaring example of it is the false Mexican law note that was sent outside of the jury room to the court. Now, that Mexican law note really falls down both tracks here. If we look at this as there's a 6 and a 6 and a 8. What happens if we go back to paragraph 3, where he enunciates, take it, his reason for wishing that he had voted the other way, which is that he had a reasonable doubt because of the lack of photographs, among other things. It seems like you have to make several inferences reading through this affidavit to find that there's a racial content that affected his vote. Your Honor, I would- You don't argue that he had any animus toward the defendant? No, no. I don't argue that he did. I argue that the animus was directed at him and that he voted to convict as a result. Mr. Pender, I'm sympathetic to your first argument. But really, should we go down the road on the second argument about racial animus? Because the defendant was black, he's Mexican, and this is a bad set of facts to deal with that. They ought to be left open to another day, don't you think? I think there's not the kind of straight line from the racial animus to the conviction that I think you would generally like to see in a case that's going to deal with this. Well, that's what bothers me. What I don't want to do is foreclose that opinion issue by this panel that cuts that off for another day. And I can certainly sympathize with that. I still want to emphasize the Mexican law note, just with respect to both 606 B2B- Well, why didn't this come out when the jury was polled? Well, the judge polled the jury and asked them if the verdict represented their views and set of standard questions, and there was no objection. Well, Your Honor, I think that what that goes to really is the question of whether or not there are procedural safeguards in this case, which is something that all the other courts that have dealt with these types of issues looked at. And I don't think there are. I think the court has to remember that he was under threat, and he was fearful with respect to the decision that he made. And when he was polled, the juror that had threatened him was standing right in the courtroom with him. So there are things that don't show up in the record that if you were there, you would notice. And I know I can't really get into that. I'm the attorney that tried this case, and I'm also the attorney that's arguing. So had you been there and seen it, I think it would jump out to you more, his hesitation and his fearfulness in speaking up. You know, I hear that, but one of the things you want to do is avoid a situation where attorneys are trolling for affidavits in the wake of a verdict, because the jurors, they give of their time, and they give of some inconvenience and cost to themselves. And after they reach a verdict, I think their whole idea of the no impeachment rule is that they should be able to participate in the workings of the criminal justice system without having it drag on and on and on through subpoenas and evidentiary hearings and questions from attorneys about this and that. And when you get into the internal deliberations of a jury, a lot of times things are said in a heated fashion. The debates are often impassioned, which I don't think is wrong, because I think that means that people took their obligations conscientiously and seriously. But I'm just worried about juror, you open it up a little bit and soon the doors open wide. And I'm concerned about just harassment of jurors who've done nothing more than participate in our process, and we need them. And this should not be part of our penalty. Your Honor, I certainly understand that concern. I think it's a concern that goes all the way back to the common law in terms of how we deal with this issue. I would just factually point out with respect to this case, this juror wrote two letters to the court. He wrote letters to my office. He essentially tracked us down to tell us that these things happened. Otherwise, we would have never known, because the letter that was sent to the court is missing a page, and we don't know what that page says. What was in the record in terms of the letter to Judge Jones is, for me, the evidence was not sufficient for all of the charges in my opinion. There's nothing at all about any type of threat, racial animus, or anything else. So it looks like maybe the only thing you have to go on is what you can glean from the affidavit. I mean, what other factual basis do you have? Your Honor, two points on that. One, I think both sides agree that that letter to Judge Jones is missing a page as to how it was scanned in and filed and docked. So I can't really speak to what Judge Jones saw. I'm not trying to accuse him of anything. You're left with the affidavit. That's all you have, correct? Yes, but to that point, Your Honor, that really speaks to a failure of the District Court to develop the record. And I think there were ways that that could have been done that would have been less intrusive. One way that I think the District Court could have and should have done it would be to have just a special hearing that operates. So have you made this argument in your brief? I'm sorry, Your Honor? Have you made this argument in your brief? Which argument? The failure of the District Court to develop a record. Well, I think it's implied by the fact that nothing was done. I have made the argument that nothing was done in this case after the letter was sent. I'm simply saying that had something been done, the record would be more developed. And one of those things would have been to hold a hearing that operates really more almost like a voir dire of that of Juror A, who, again, sent the letters to the court, sent the letters to us to dig into exactly what happened in that jury room. Did you ask for that hearing? I did not at the time, Your Honor. But I would point out that by the time I'd gotten it, then my mind was on the motion for new trial in an evidentiary hearing. I'm simply saying that's something the court could have and maybe should have done to develop the record a bit more. At least then we'd be able to say for sure exactly what happened in the jury room, besides just what's in the act. Well, thank you, Counsel. We look forward to hearing from you in Robotov. Thank you, Your Honor. Ms. Rock, I think it is. We'd be pleased to hear from you. Thank you, Your Honors. Your Honors, I think that the key point here is that the court actually was not authorized to conduct the hearing now proposed by counsel, because the very heart of the impeachment rule is that you do not delve into the statements and incidents that occurred during jury deliberations between the jurors, the effect that such statements and incidents have on the jurors and their votes, or their mental processes. And that is exactly what this case implicates. It does not implicate outside influences. It does not implicate racial animus tainting the jury verdict. I think counsel is correct that there's a conflating of extraneous prejudicial information and outside influences. But regardless of which one of those two prongs you look at, the statements alleged in the would be defined as anything brought from the outside impacting the jury. At best, the affidavit alleges intimidation. He uses the word threatened at one point in his affidavit. But in fact, when you look at what he says, he says, at some point, juror B told me I know where he lives. At some point, juror B discussed that he owns guns. And then later during deliberations, he became aggressive. The law is clear that aggressive posturing by a juror is exactly the kind of statements and incidents in the jury room that the no impeachment rule is directed at. And as Judge Wilkinson has acknowledged, we presume the Supreme Court has recognized that jury systems are a system involving people. And they are not going to be perfect. And one would expect if you put 12 people in a room and tell them to make a decision, and it's a small room, and they know they cannot leave until it's done, people are going to get loud when they disagree. They may get forceful. And a person may feel intimidated. That does not mean that the behavior of the juror that is the source of the intimidated feelings is behaving in a way that is an affront to the justices. Well, ma'am, including Tanner, aren't courts concerned how interactions impact jurors and not the mechanics of those interactions, for example? This is a hypothetical. Obviously, if somebody pulled a gun on the juror on the way home, that would be a threat you wouldn't argue about. But what if the same thing happened in the jury room? Does the place where it happened make a difference? Because the act is the same. Well, I would suggest that that would occur in the jury room. The answer is not that there was. The gun itself may be an outside influence. But let's say it was words. I'm going to kill your daughter if you do not. The way that the court would need to get at that is not that an outside influence was brought to bear. It is that there is potentially an exception, and it has been alluded to by the Third Circuit in the Lacani case, which was cited in our district court briefing, that if there is a coercive threat or something with the coercive effect of a threat or bribery, that that may either constitute some kind of extraneous information or would be its own independent Sixth Amendment problem. But shoehorning language that intimidates a juror into the outside influence exception, which is clearly meant to be that some piece of information or some act that is outside the context of the communications between the jurors themselves. And that's what is happening here. We're trying to shoehorn that and to shoehorn these statements into the outside influence. One thing is the bottom line. One thing that I asked myself is whether there's any evidence that the jurors voted to convict Mr. Brown out of racial animus or for an obviously impermissible reading. And I don't see that. No juror has testified to that, and it has to get pretty speculative to think that somebody actually had their vote in the case to convict, influenced by this exchange that occurred in the jury room. Now, the exchange was not an admirable one. It's not the way we hope people communicate. But as you put out, a jury deliberation often isn't a nice little tea party. People care. But I don't see how, at the end of the day, somebody voted to convict this defendant on the basis of the conversation that took place. I think that's exactly right, Your Honor. And I would point to, in support of that, the distinction between the note about he's a juror trying to apply Mexican law and the other intimidation that may have occurred in the jury room. That note suggests some misunderstanding, potentially, of what he was trying to argue in support of why there was not enough evidence. But it is not a clear statement of racial animus. It is not a clear statement of racial bias. And it certainly does not meet the test of establishing that racial stereotypes or racial animus were a significant motivating factor in the jury verdict. It requires a chain of suppositions and analysis to get to any kind of conclusion that the fact that there was a Mexican juror who was disagreeing with the rest of the jurors somehow paints the verdict and makes us concerned about racial animus in the jury room. And so I would agree with Your Honor. They're just, I think, there's no application of the Pena-Rodriguez exception that would apply here. And this court has already acknowledged that that exception needs to be construed narrowly, and it needs to be based upon clear statements that establish significant motivating improper factor led to the verdict. I ask Mr. Pena this question. A threat is a threat, whether it's made outside the jury room or inside the jury room. Where's the logic in that, if it's a true threat that impacts the jurors' deliberations? So if there were a true threat that impacted the deliberations, then the verdict would be based upon, or at least that juror's vote, which is necessary to the verdict, would be based upon a fact that was completely unrelated to the evidence in the case. It would be based solely upon the fear of the defendant of that threat being acted upon. And if there was a, if the case involved a true threat, I think there would be potentially a very different outcome to this case. But there is no true threat in this case. Well, he actually, there's more to it than just the two things you said. He actually got in his face, buffed himself up, so along with whatever he said. So there's a distinction between threat and intimidation. And frequently in criminal law, when we are talking about threats and intimidation, we lump them together. Well, don't you view it from the eye of the victim and not the defendant? In many instances, yes. But here, you're talking about undermining a core tenant of the Anglo-American legal system. And every case that has acknowledged exceptions requires clear statements, clear evidence that something improper happened. This affidavit is not clear evidence of that. One interpretation is he said, he told me he knows where I live, he has guns, and he puffed up in front of me, and that made me scared. But this was a three-day jury trial. And a very reasonable assumption is they walk into the room together, and Juror B says, hey, I know you. You live down the street, or you live in my town. I know where you live. So that is in the back of Juror A's head. But there is absolutely no intent on Juror B to equate those things together. A comment that I know where you live and, oh, hey, I really love my guns in southwest Virginia is not a common conversation. Well, that actually defies law. He's Mexican, and the juror is white. I guarantee you there's no relationship between them. Well, and the statements don't suggest that there is, only that he knows where he lives. I mean, it's a rural area. You frequently know where your neighbors live, even if you don't know that. And he doesn't allege that Juror B said, I know you. He just recognized him from the community. And it requires you to deduce, I think, to find that this statement is a threat, requires you to put together a string of suppositions that are just not supported. The law does not allow, I would submit, for a string of suppositions to establish the kind of clear statement to overcome the impeachment rule. The impeachment rule is 237 years old. And this court has said, courts over and over again have said that what you are looking for is something that is an affront to justice. Does the timing of this matter as well in terms of whether the district court abused discretion? How long after the trial had concluded, what time elapsed between the time the trial had concluded and the time the affidavit was signed and submitted to the attorney? I believe it's about four months. Four months. The letter came within a week or so of the end of the trial in September. And the affidavit was submitted, I believe, in January. There was a thorough voir dire in this case? Yes, sir. And there was a poll of the jury? Yes, sir. And instructions repeated twice. The jurors are to find their own verdicts. And the juror A is clearly on notice. He can pass a note to the court security officers if there's a problem. If your honors have no further questions. Thank you. Excuse me, Judge Floyd, do you have some further questions of counsel? No, sir. Judge Agee? No, sir. I don't as well. Thank you very much. Mr. Pender has reserved some rebuttal time, and we'd be happy to hear from you. Thank you. Thank you, your honor. First and foremost, I would just like to point out the fact that there's really no procedural threat. I just don't know what question a judge could ask during voir dire that would allow us to strike a juror based on the fact that that juror is going to threaten another juror. And so I just think that that needs to be pointed out. And I think what also needs to be pointed out is the Mexican law note was racial animus because it was false. Now, whether that fits the Pena-Rodriguez argument, I think most likely that issue is settled. But I do think when you consider it in the context of the threats and the pressure put on juror A, it's still relevant. It was racial animus precisely because it was not true. And he was the only Mexican man on the jury. And the jurors knew that when they sent the letter. So what is your best case for a Rule 606 argument? The threats against the juror, two. The threats against the juror and the note which was sent outside. What's your best case? Oh, in terms of the law. Your honor, there's... That's what we're doing here is the law. You have a case that you want us to look at in particular? I don't think there's cases that are helpful either way. I think, actually, if you look at the analysis in Pena-Rodriguez, though it deals with racial animus, it falls along the lines of what we're talking about here with respect to the threats. Because I think when you get to the basis of it, where it really starts, it's going all the way back 170 years and going back to United States v. Reed, in which it said there are certain situations that violate the plainest sense of justice. And I think that a threat towards a juror is certainly that kind of case. And I would also, again, point the court back to Tanner and the legislative intent, because I think that's important here. It specifically says that threats against someone's family would be an outside influence. And so I think if we're looking at this as a threat, and if we're looking at the affidavit, that's the only way I think you can look at it, because he says he was threatened, then I think wherever threats fall on that spectrum of inside versus outside, they certainly fall more on the outside part of that spectrum. I think the court and the government here kind of persist in this really rigid distinction that because it happened in the jury room, it's not an outside influence. The law specifically says not to do that. And I think if you look at the court's opinion below, it doesn't have any other analysis of the threat other than I'm not going to consider it because of when it happened. That is where the abuse of discretion is. Had the court said, I'm not going to look at it because of when it happened, but I also don't think it's a threat, and I also don't think it's X, Y, and Z, maybe we have a different conversation. But the only thing in there is because of when it happened, I'm not going to consider it. Our point is that is the rigid distinction that the cases speak against. So actually, if I can, I think I'm going to backtrack a little bit. I think my strongest case is actually Tanner because it makes that point. And so if I had to point the court one place, it would be United States v. Tanner as to the rule 606B2BR. And it would be specifically the legislative intent in that case, as well as the analysis of the outside. Well, do you know, speaking in terms of this outside inside, a lot of times jurors will bring their personal experience and background into a deliberation. That's kind of unavoidable. We have cases where there was a Bible reading and we have cases where someone was intoxicated and we have cases where someone was sort of a juror dozed off. And then there are other cases, inevitably, where jurors are going to speak from their own background and their own personal experience. But that doesn't necessarily make it an outside case because jurors are inevitably going to be taking their personal characteristics into the jury room. That's why we have juries and that's why we want to have juries that represent a cross section of the American public. And so I just worry about any time someone brings their own background and experience and expresses that in a jury discussion, that that makes it an outside influence. I don't think that's true. What do you say with respect to that, sir? Your Honor, I say that with respect to that, in this case, the outside influence was the threats. The things that the courts described- But how it has to be, I think part of the district court is not, he doesn't think it's a threat. Your Honor, as I recall, I don't believe the district court said that, though. I think the district, what I recall the district court saying with respect to that argument was, I'm not going to consider it because of when it happened. The district court never said it wasn't a threat. The government has argued that it's not. The district court didn't analyze it at all. It said because of when it happened, I'm not going to consider it. That's what we're arguing was the abuse of- But if it had been construed as a threat, then there might have been a different result. But the way that the district court ruled would almost presuppose that he did not consider it to be a threat. Or at least a threat that, at least a threat or something that influenced the vote. I come back to the basic point I made, and that is at the bottom, at the end of the line, we want to make sure that Mr. Brown received a fair trial. And I don't understand how the discussions in the jury room deprived him of a fair trial. One can make all kinds of speculative inferences about it, but wouldn't you need something more concrete? No, Your Honor, because Juror A is telling you that he was not impartial because he was So I think that's what we're really going to. He didn't have an impartial jury. Now, what happened before that, I don't have any argument with that. I don't even have an argument with the court's instruction to the jury after the fact. No more than we knew at the time. I think it's the best the court could have done. But Juror A has made it very clear he was not impartial because his vote was not his own. He only voted that way because of his threat. And excuse me, counsel, it's an interesting argument. I want to give you some extra time here. But if we take your view of it, of what the affidavit said, and we took your view, wouldn't that just become boilerplate for all kinds of future affidavits and lawyers would say to counsel, here, here's what you need to put down. We've got this case out there that says because of this threat that was made, or because of this intimidation that was made, it affected me. In other words, this would be boilerplate for innumerable claims that would compromise the privacy and unimpeachability of jury deliberations. That's what concerns me, is that a lot of times people say, oh no, this is a one-off, or this is a singular case. But I'm not so sure. It seems to me that once you've breached that wall of non-impeachability, you begin to open it up to a pretty significant extent. I'm just explaining what my reservations are. And I've taken your time with my questions. So I want to give you a chance to respond. Your Honor, I appreciate you allowing me to respond to that. That is a concern that I think any litigant that's being fair understands. And I certainly understand that. But I think exceptions to the rule exist for a reason. And I think we do have to be careful to say that simply because of finality, we're not ever going to apply three statutory exceptions that exist, and at least one court-made exception that exists, because we're afraid that lawyers will track down jurors and get after Davidson and make up things. For one, I think there are other ways of dealing with that, one of which is if a lawyer did that, it would be unethical, and they'd probably lose their license if they went to a juror and said, hey, lie, make this up so we can get this vertical. So I mean, I think you have things in place to address attorneys doing that. But I think you have to be equally concerned, if not more concerned, with what you message to the public, to people who are charged criminally, that the only right that they have, the only thing that they can exercise is to look at the government and say, put 12 people in that jury box and prove it. There's already a chilling effect on that because of the well-established federal conviction rate, mandatory minimums. That's a different conversation. But how do I advise a defendant that you should exercise your right to try, particularly in a place like Abingdon, Virginia, which, God love it, has very little diversity. How do I advise a defendant to exercise that when they've got to look at a situation like this and say, well, I'm lucky if I get one person of color on the jury. And if the rest of the jurors act this way towards this person, if they threaten this person, if they send out notes, nothing will be done about it. Well, I started out with this true threat analysis. All that would happen in this case is we send it back for evidentiary, and the judge will make a decision whether it's a true threat or not. If it's not a true threat, case over. Your Honor, I think that's correct. I know I've asked for more than that, but I think that's correct. Well, you might not get that.  And I recognize that at the time. It worked to go back, and that kind of gets to, Judge Agee, what I was talking with you about earlier. It would at least develop the record more with respect, if nothing else. All right. Thank you very much. Judge Agee, do you have any further questions? Yes, sir. We'd like to thank you both for your arguments, and we appreciate having you here. Sorry we can't come down and shake your hands, but we're appreciative nonetheless. We'll take a five-minute recess and then reconvene.
judges: J. Harvie Wilkinson III, G. Steven Agee, Henry F. Floyd